FILED_____ ENTERED
_____LOGGED_____RECEIVED

MAY 20 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF
THE SUBJECT ELECTRONIC DEVICES
DESCRIBED IN ATTACHMENT A

Case No. ___19 - 1 5 9 3 BPG___

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, James Walsh, Task Force Officer of the Federal Bureau of Investigation having been duly sworn, state as follows:

1.     I submit this affidavit in support of a warrant authorizing the search of the devices described further below and set forth in Attachment A (the "SUBJECT ELECTRONIC DEVICES"). The applied-for search and seizure warrant would authorize the seizure and subsequent forensic examination of the SUBJECT ELECTRONIC DEVICES for the purpose of identifying certain electronically stored data pursuant to the protocol described in Attachment B.

2.     Based on the facts set forth in this affidavit and based on the investigation in which I have participated, I submit that there is probable cause to believe that the co-conspirators described in detail below have committed violations of 21 U.S.C. § 846 (conspiracy to possess with intent to distribute a controlled substance) and 21 U.S.C. § 841 (possession with intent to distribute and the distribution of a controlled substance). Furthermore, I believe that there is probable cause that fruits, evidence, and instrumentalities of these crimes are located in the SUBJECT ELECTRONIC DEVICES.

### BACKGROUND AND EXPERIENCE

3.     I am a Detective with Montgomery County Police Department (MCPD), Special Investigations Division, Drug Enforcement Section, Major Offenders/Conspiracy Unit and have been employed with the MCPD since July 2008. Prior to being employed with MCPD, from

1

October 2001 to July 2008, I was a sworn law enforcement officer with the United States Park Police. I have been specially deputized as a Task Force Officer (TFO) by the Federal Bureau of Investigation (FBI) and has authority under Title 21, United States Code, since October of 2014. I graduated from the Federal Law Enforcement Training Center (FLETC) in 2002 and the MCPD Training Academy in January 2009.

4.      During my seventeen years as a law enforcement officer, to include the past five years of conducting undercover narcotics investigations, I have performed controlled purchases of drugs and street level surveillance of drug transactions; utilized informants to make controlled purchases of drugs; worked in an undercover capacity on several occasions involving narcotics investigations targeting street level and interstate narcotics traffickers; obtained and executed search warrants as a result of drug investigations; attended numerous courses and seminars covering drug recognition, interdiction, money laundering, conspiracy investigations and secure communications interception; participated in and been a co-case agent on Title III wiretap investigations involving federal narcotics violations; and been recognized and testified as an expert in narcotics trafficking by the Circuit Court and Juvenile Court for Montgomery County, Maryland.

5.      I have been involved in the investigation of several Organized Crime Drug Enforcement Task Force (OCDETF) investigations involving drug trafficking organizations. I have extensive experience in debriefing defendants, working with confidential informants, and various persons with direct experience with the methods used to distribute controlled substances.

6.      I have also attended numerous other training classes and seminars related to undercover narcotics investigations, drug interdiction, conducting interviews, drug recognition and fraud and money laundering. Additionally, I have developed, taught and continue to teach several

continuing educational courses to sworn officers on drug investigations

7.      Based on my training and experience, I am familiar with the means and methods that narcotics traffickers use to import and distribute illicit drugs. I am familiar with the support and assistance that narcotics organizations require to conduct their illegal activities. I am also become knowledgeable about the criminal statutes of the United States, particularly in the laws relating to violations of the federal narcotics and conspiracy statutes.

8.      Through this training and experience, I have learned about the importation, manufacture, concealment and distribution of controlled substances, including, for example, cocaine, heroin, fentanyl, fentanyl derivatives, phencyclidine (PCP), and marijuana. I have become familiar with the use of telephones by drug traffickers to communicate, the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits of illegal drug dealing. Additionally, based on my training and experience and his participation in other narcotics investigations, I know the following: that it is common for drug dealers to "front," or provide on consignment, controlled substances to their customers; that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, vehicles and/or businesses for ready access; that it is common for drug dealers to conceal proceeds from law enforcement authorities and rival narcotics traffickers; that drug dealers routinely use cellular telephones to facilitate their drug distribution operations; that drug dealing is an ongoing process that requires the development, use, and protection of a communication network to facilitate daily drug distribution; that drug dealers use telephones to thwart law enforcement efforts to penetrate the drug dealers' communication networks; and that narcotics traffickers commonly use "coded" language when speaking with other

3

drug traffickers in order to thwart detection by law enforcement agents who may be intercepting their communications.

9. Based upon my training and experience and my participation in this and other narcotics investigations, as well as my conversations with other agents, I know the following:

 a. Narcotics traffickers often maintain at locations including their residences, businesses, vehicles, and stash houses, financial records and financial instruments related to their narcotics transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, precious metals, and real estate records;

 b. Narcotics traffickers frequently maintain at locations including their residences, businesses, vehicles, and stash houses, records of their narcotics transactions including, but not limited to, books, ledgers, records and other documents relating to the manufacture, transportation, possession, and distribution of controlled substances. Such documents are frequently maintained where the traffickers have ready access to them, including in their homes;

 c. Narcotics traffickers commonly maintain at locations including their residences, businesses, vehicles, and stash houses, identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts;

 d. Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises;

 e. Narcotics traffickers commonly maintain many of the foregoing items in cellular telephones, computer files, on disks, and on hard drives; removable storage devices

such as "Thumb Drives";

      f.      Narcotics traffickers commonly maintain at locations including their residences, businesses, vehicles, and stash houses, numerous cellphones that they use to contact their coconspirators, including their sources of supply, their distributors, and their customers;

      g.      Narcotics traffickers often use video recording devices, including cellular telephones, to take video recordings of other members of their organization often engaging in illegal activities such as the distribution of narcotics, as well as video recordings documenting the purchase of assets with the proceeds of narcotics trafficking.

10.     Specifically with respect to cellular telephones, computers, and other "smart" electronic devices, such as tablets, I know the following information based upon my training, experience and participation in this and other investigations involving drugs and firearms, as well as conversations with other investigators:

      a.      Individuals engaged in drug trafficking offenses often use cell phones and electronic devices to communicate with suppliers; to place orders with suppliers; to communicate with customers; to receive orders from customers; and to choose meeting times and locations for the distribution of controlled substances. The individuals engaging in drug trafficking will often use a combination of voice calls and text messages to coordinate drug transactions. Individuals engaged in drug trafficking offenses also use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity.

      b.      Drug trafficking is an ongoing and recurring criminal activity.  As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking

is an illicit commercial activity that is characterized by regular, repeated criminal activity.

      c.      Cellular telephones, computers, and other smart devices are an indispensable tool of the narcotics trafficking trade. Narcotic traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotic traffickers. In addition, narcotic traffickers will often change their cellphones following the arrest of a member of their DTO, or at random in order to frustrate law enforcement efforts.

      d.      Drug traffickers often place nominal control and ownership of telephones in names other than their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

      e.      Drug traffickers utilize multiple and different types of communication devices, and change the numbers to these communication devices frequently. This is done to avoid detection by law enforcement personnel. I also know that drug traffickers will dedicate different communication devices for different aspects of the trafficking organization. An example of this would be a drug trafficker utilizing one cellular telephone to communicate with customers, and utilizing another cellular telephone to communicate with a source of supply of drugs.

      f.      Cell phones and similar smart devices associated with drug traffickers include various types of evidence. They may contain relevant text messages or other electronic communications; they may contain electronic address books listing the phone

numbers and other contact information associated with co-conspirators; and they may contain other types of information, including the information contained in Attachment C.

      g.     The mere fact of a cellular phone's call number, electronic serial number or other identifying information may be evidentiary value as it may confirm that a particular cell phone is the phone identified during a wiretap, pen register, or other electronic investigation.

      h.     I know from my training, knowledge, and experience that cell phones and other smart devices often record the phone's historical location data, indicating the location of stash houses, distribution points, and supply sources.  I also know that capturing and analyzing the cellular telephone geolocation of a phone used by a drug trafficker can provide important evidence of: (1) the location of the drug trafficking itself, including the spot where drug sales are conducted, solicited, or transacted; (2) the location where a drug dealer stores and stashes his drugs, including his personal residence or another dwelling used for the storing of controlled substance; (3) the location of suppliers, customers, or coconspirators that a drug dealer may meet with; (4) the location of meetings among various members of the conspiracy; (5) corroboration of physical drug trafficking activity observed by investigators; and (6) the overall pattern of travel for a particular drug trafficker.  Further, the capture of geolocation information can corroborate physical observations of drug transactions and other conspiratorial conduct of POPS and others. Accordingly, the location of a cellular phone used by a drug trafficker can provide important evidence of the drug trafficking conspiracy.

      11.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

12.     In 2016, Special Agents and Officers of the FBI, DEA and Montgomery County Police Department, Maryland (MCPD) began investigating a drug trafficking organization (the "DTO") that distributes large quantities of heroin and cocaine in and around the Baltimore metropolitan area. In the course of the investigation, FBI/MCPD identified Gregory BUTLER, also known as "Sags" or "Little Dick," as a leader of the DTO.  The DTO has several associates to include Edward HALL and Terrance MEDLEY, among many others described in detail below.

### Interception of Communications over BUTLERS's Cellphones

13.     The DTO is a narcotics source of supply for customers traveling from Maryland, Virginia, West Virginia, Pennsylvania, and the District of Columbia. BUTLER has both the access and means to distribute kilogram-level quantities of heroin, cocaine, and crack cocaine. Weekly narcotics distribution is estimated at a range of one or more kilograms, supplied to customers by vetted DTO re-distributors at one of several pre-determined buy locations across the Baltimore metro area. His narcotics source(s) of supply remain unknown. Over five hundred individual customers have purchased from BUTLER by contacting one of his many phones, purchasing between user "point" quantities and/or re-distribution quantities exceeding 100 grams.

14.     On October 2, 2018, the Honorable Catherine Blake, United States District Judge for the District of Maryland, authorized the initial interception of wire and/or electronic communications occurring over (443) 641-4783 ("TT1") and (347) 744-5958 ("TT2"), which were cellular telephones used by BUTLER. As detailed further below, BUTLER has used multiple telephone numbers over the course of the investigation.

15.     On October 26, 2018, the Honorable Catherine Blake, United States District Judge

for the District of Maryland, authorized the continued interception of wire and/or electronic communications occurring over TT1 and TT2. Judge Blake also authorized the initial interception of wire and/or electronic communications occurring over (304) 809-4934 ("TT4") and wire communications occurring over 240-899-3787 ("TT5").

April 3, 2019 Takedown of the DTO

16.     Pursuant to numerous federal arrest and search warrants, on April 3, 2019, law enforcement conducted enforcement actions against the BUTLER DTO, resulting in the arrest of BUTLER and many of his associates. These events occurred throughout Maryland, Virginia, and West Virginia. At many of these locations electronic devices were recovered associated with various DTO members.

*Subject Device-1*

17.     On April 3, 2019, Darlene BEST, who is BUTLER's mother, was placed under arrest pursuant to a federal arrest warrant at her residence located at 3204 Normandy Woods Drive, Apartment E, in Ellicott City, Maryland. In conjunction with her arrest, a federal search and seizure warrant was executed.

18.     Recovered within BEST's residence were various documents, including Western Union receipts, documents associated with BUTLER, money order receipts, and approximately $100,000 in U.S. Currency believed to be illegal drug proceeds. The recovered money was heat-sealed in plastic wrap and concealed in a duffle bag.

19.     Based on my training and experience, I know that drug traffickers will often utilize family members and associates to "stash" their illicit proceeds or drugs. The tactic of using various locations assists the trafficker in concealing either their proceeds or product from discovery by rival competition or law enforcement.

20.     Also recovered from BEST's residence was a black Apple I-phone bearing IMEI 352987091210551 (**SUBJECT DEVICE-1**).

*Subject Devices-2, -3 and -4*

21.     On April 3, 2019 a federal search and seizure warrant was executed at 32 Stockmill Road, Apartment F, Pikesville, Maryland. This is the residence of Darean COOK who is the mother of several of Gregory BUTLER's children. Law enforcement recovered documents, including money order receipts. Also recovered from the residence was a black Apple I-phone bearing serial number FD6W921LJCM2 (**SUBJECT DEVICE-2**), an Apple I-phone in a blue case bearing serial number FDCVP16MJCM1 (**SUBJECT DEVICE-3**), and a white Apple I-phone bearing evidence bar code E6096504 (**SUBJECT DEVICE-4**).

22.     Throughout the course of this investigation, COOK and BUTLER have utilized electronic communication to discuss matters related to the operation of BUTLER's illicit enterprise.

23.     On January 17, 2018, BUTLER was placed under arrest pursuant to a state warrant for domestic assault. During his detention on state charges, BUTLER made several calls to COOK. On January 18, 2019 at approximately 7:00 p.m., for example, law enforcement reviewed a lawfully recorded jail call made to the telephone number 443-839-3088, which investigators know was utilized by COOK. Both COOK and BEST were on the call. Towards the end of the call, BUTLER instructed COOK as well as BEST to tell his street-level distributors to give out "samples" to customers. BUTLER recognized that following his unexpected arrest there was a disruption in the DTO's sales. Numerous customers who typically purchase on a near daily basis had not been, or would not be, able to obtain any drugs. Based on my training and experience, BUTLER instructed his distributors to give away drugs for free in an effort to retain drug customers

following this interruption.

24.     On February 9, 2019 at approximately 7:53pm BUTLER again called COOK.  A portion of the call is listed below:

| | |
|---|---|
| BUTLER: | Yeah I say how long you gonna be in the house though cuz I ready get the car washed and shit and I didn't know you ready leave out right now or [UI] |
| COOK: | I don't know. I don't know. How long you about to be |
| BUTLER: | Man I don't know I'm just tryin get the car washed. Hello. I mean I don't know |
| COOK: | I guess just call me when you done |
| BUTLER: | Why what you about to do |
| COOK: | Not about to do nothin |
| BUTLER: | I though you was goin somewhere |
| COOK: | I mean if you need your phone, don't I have to wait? |
| BUTLER: | Mean you can come meet me if that's the case |
| COOK: | No I don't feel like doin all of that... I don't feel like doin all that |
| BUTLER: | Mean if you about to leave out what difference do that make man |
| COOK: | Cuz I don't know what I'm about to do yet |
| BUTLER: | The fuck you mean you don't know what you about to do, you just said what you was about to do |
| COOK: | I don't know if I feel like it. I'm sittin here debatin |
| BUTLER: | So how many missed calls the phone got |
| COOK: | I don't know |
| BUTLER: | can you hit the top button and see real quick. |

25.     Based on my experience in this investigation, I know that BUTLER used several different cellular phones to conduct drug sales.  In the above listed call, COOK was in possession of one of these phones, and BUTLER was trying to obtain it.  COOK knew that BUTLER needed

the phone, as indicated by her question "don't I have to wait?". Later in the call, BUTLER instructed COOK to see "how many missed calls the phone got" and "hit the top button and see real quick." I know that BUTLER had hundred of drug customers who contacted him on a daily basis. I believe he asked COOK to see how many missed calls were on the phone in an attempt to gauge how many potential sales he may have missed.

*Subject Devices-5 and -6*

26.     On April 3, 2019, Desmond RINGGOLD was placed under arrest pursuant to a federal arrest warrant at his residence located at 1718 Druid Hill Lane, Apartment 2, Baltimore Maryland. In conjunction with his arrest, a federal search and seizure warrant was executed at RINGGOLD's residence.

27.     Law enforcement recovered documents in his name, $1,900.00 in U.S. Currency, a black Apple phone bearing evidence barcode E5433188 (**SUBJECT DEVICE-5**), and an Apple I-pad with a white-grey cover bearing serial number DLXA49LFG5V3 (**SUBJECT DEVICE-6**).

28.     In the course of this investigation, RINGGOLD was identified as a "Lieutenant"— i.e., supervisor—for the BUTLER DTO. As evidenced by intercepts, among other means, RINGGOLD was responsible for distributing drugs to the street level operatives and then picking up illicit proceeds of drug sales.

29.     On December 27, 2018 at approximately 9:05am, RINGGOLD, using the telephone number 410-949-6198, called Edward HALL who was a street level distributor for the BUTLER DTO. A portion of the call is listed below:

| | |
|---|---|
| HALL: | Hello |
| RINGGOLD: | ugh the 4 there. the 4 there and that 1 and half. I told you. |
| [HALL interrupts] | |
| HALL: | Where you send them at Mount Royal or or |

| | |
|---|---|
| RINGGOLD: | Yea Mount Royal |
| HALL: | Alright the 4 there |
| RINGGOLD: | yea and that one and half I told you to get put that in separate. the one and half they 20 out |
| HALL: | They 20 minutes out alright and when I'm out I'll just go right down *[UI]* get the get um well just get a card right? |
| RINGGOLD: | Yea |
| HALL: | I'll go to 7-Eleven or something. Get an AT&T card. And I know I'll put it on there cuz you show me |
| RINGGOLD: | Ugh ugh let me know when um let me know when Mazzi get there so i can know where to send them |
| HALL: | Alright yeah because I'm under 40 |

30.     With respect to RINGGOLD's statements "the 4 there" and "that one and half," I know from my training in experience in this investigation that the numerical terms of "4" and "one and half" represent quantities of drugs that the BUTLER DTO is distributing. In the second portion of the conversation, RINGGOLD asked HALL to let him know when "Mazzi" arrives so that he will know "where to send them." I know that "Mazzi" is a nickname for the street-level distributor identified as Terrance MEDLEY. When RINGGOLD states "where to send them," I believe this statement referenced the location where MEDLEY will want customers go to conduct the drug deal. HALL agreed to provide the location, and stated that "I'm under 40" meaning that his current drug supply is diminishing insofar as "40" represented another quantity of drugs.

*Subject Devices-7 and -8*

31.     On April 3, 2019, Tirell SAUNDERS was placed under arrest pursuant to a federal arrest warrant in Room 519 of a hotel located at 8801 Lochraven Boulevard in Towson, Maryland. Inside Room 519 officers found a gold colored Apple I-phone with a black case bearing IMEI 359238069975285 (**SUBJECT DEVICE-7**) and silver Apple I-phone with a cracked screen and

a green/grey case bearing IMEI 352018076957907 (**SUBJECT DEVICE-8**).

32.     SAUNDERS was known to operate a silver Acura TL with Maryland registration 3DK6008. The Acura was located outside of the hotel room where SAUNDERS was arrested. On April 3, 2019, pursuant to a federal search and seizure warrant the Acura was searched. In the glove box of the Acura officers found approximately $8,090.00 in U.S. Currency. The U.S. currency was separated into bill folds, which is a common practice of drug traffickers.

33.     In the course of this investigation, SAUNDERS (a.k.a. "Pretty") was identified as another "Lieutenant" for the BUTLER DTO. Like RINGGOLD, he too was responsible for distributing drugs to the street level operatives and then picking up illicit proceeds of drug sales. He used cell phones in furtherance of these illegal activities.

34.     On January 17, 2019, at approximately 11:31 PM, RINGGOLD received a call from the telephone number 443-703-8903, which investigators know was SAUNDERS's telephone number. RINGGOLD and SAUNDERS then engaged in the following conversation:

RINGGOLD:      Yo

SAUNDERS:      Whoadie.

RINGGOLD:      Whoadie.

SAUNDERS:      Yeah I just talked to Mazzi so, you talk to Little Dick?

RINGGOLD:      No I'm waitin' for him to call me.

SAUNDERS:      Ah damn I about to say what the fuck the man gon' do about tomorrow...He ain't-he ain't never make it back to see me.

RINGGOLD:      Aight.

SAUNDERS:      So I only got, um, 93.

RINGGOLD:      That should hold niggas over tomorrow.

SAUNDERS:      Yeah...Right until a nigga talk to him.

RINGGOLD:        Mmm.

SAUNDERS:        I don't know what Mazzi got left.

RINGGOLD:        Mmm.

SAUNDERS:        Oh matter of fact I think Mazzi said he got like 20 30s some shit like that.

RINGGOLD:        Oh aight.

35.     During the above conversation, RINGGOLD and SAUNDERS discussed BUTLER's arrest that had occurred several hours earlier that day and expressed concerns over how the DTO would continue to operate based on the dwindling supply of drugs. SAUNDERS remarked that he only had "93" left, which I believe meant 93 grams of drugs, but RINGGOLD alleviated his concerns noting that that supply should be sufficient for the day's narcotics business.

*Subject Device-9*

36.     On April 3, 2019, Timothy DOWNING was placed under arrest pursuant to a federal arrest warrant by law enforcement officers from the Montgomery County Department of Police. At approximately 9:45am FBI law enforcement officers took custody of DOWNING. He was in possession of a silver Samsung cell phone model SM-J327P, DEC number 8916889690846451 (**SUBJECT DEVICE-9**).

37.     Through the investigation into the BUTLER DTO, DOWNING was identified as a consistent customer who purchased substantial quantities drugs. All of his communications with the DTO were generated through the use of a cellular phone.

38.     On December 26, 2018 at approximately 3:36pm, phone number 443-641-4783 (TT1), which is a phone used by the BUTLER DTO, sent an outgoing SMS text message to the telephone number 240-675-1827, which is a telephone number used by DOWNING. The message

15

stated "2002 mount royal ter".   On December 26, 2018 at 4:30pm, TT1 received an incoming telephone call from DOWNING's phone.   The call between BUTLER and DOWNING is as follows:

| | |
|---|---|
| BUTLER: | Yo |
| DOWNING: | Yo I'm here |
| BUTLER: | How many yo? |
| DOWNING: | Ugh 10 |

39.     Based on my training and experience in this investigation, the above listed SMS text exchange and subsequent intercepted call indicated a drug transaction between DOWNING and BUTLER.  BUTLER provided a location for the transaction ("2002 mount royal ter").  Shortly thereafter, DOWNING called BUTLER to advise him of his arrival and the amount of drugs he wished to purchase ("10").

*Subject Device-10*

40.     On April 3, 2019, Russell OLIVER was placed under arrest pursuant to a federal arrest warrant at his residence located at 25 Boehrer Lane, Bunker Hill, West Virginia.   In conjunction with his arrest a federal search and seizure warrant was executed at that address.

41.     Recovered from OLIVER's residence was a BLU cell phone with a clear case bearing serial number 352908091349322 (**SUBJECT DEVICE-10**).  Also recovered was a .22 caliber handgun and corresponding .22 caliber ammunition.

42.     Through the investigation, OLIVER was identified as a re-distributor who purchased drugs from the BUTLER DTO and then resold them in West Virginia. On February 14, 2019 at 12:01pm, OLIVER called BUTLER on BUTLER's phone. In a previous call, OLIVER had stated that he had been arrested, which was the cause for an interruption in their business relationship. During the portion of a later call transcribed below, BUTLER then indicated that

16

OLIVER owed him money for a drug debt:

| | |
|---|---|
| OLIVER: | Yea |
| BUTLER: | finish what you were saying now |
| OLIVER: | Ugh fucking that dude ugh that was coming the dude that was running down the road for me |
| BUTLER: | yea |
| OLIVER: | His fucking brother got into his shit he went into the store this mother fucker gets into the shit that he had stashed that he had just got from me and fucking ODs at the goddamn passenger seat Tim comes out and finds him and he's tryin to |

[Butler interrupts Oliver]

| | |
|---|---|
| BUTLER: | Alright listen. yo yo yo I'm at work right now just try and make a long story short. so hear me out so what about umm the money for the parts the other. ever gonna re-arrange that [talk over each other] you say you got locked up |
| OLIVER: | Yea I'm gonna have to hurry up and make it up man umm can I can I send can i start to send some of my people that's got bread just fucking send em down to you to grab and I'll just whatever extra I make on that you just pocket that |
| BUTLER: | No we ain't gonna keep doing that shit bro heeelll no man |
| OLIVER: | Well I mean if they bring cash |
| BUTLER: | Oh yeah Well yea you bring cash yea |
| OLIVER: | I'll send em with cash I got my new Roger, Roger's straight as fuck I'll send him down with cash [talk over each other] |
| BUTLER: | Yea that's cool. How long it gonna take you to square me away though |
| OLIVER: | Then I'll fucking go ahead and start hustling right now to do whatever I need to do |
| BUTLER: | I understand I say I understand so how long it gonna take for you to square me away |
| OLIVER: | As fast as I can dog i ain't gonna leave you hanging I always pay you know that I just there wasn't shit I could do they wanted fucking 10,000 |

> cash only bond I got a lawyer instead, they knocked that shit out cuz I flushed everything they didn't get shit I fucking flushed it all they found my weed and my pipe

BUTLER:   *[UI]* that's a lot of mother fucking cash you owe me. how we gonna do that

43.    Based on my training and experience in this investigation and others, OLIVER was trying to explain to BUTLER that he currently did not have the money to pay BUTLER money owed. OLIVER stated that he could send associates with cash to pay for a portion of what he owed ("I'll send him down with cash"). BUTLER asked how long it will take OLIVER to pay his debt. OLIVER was non-committal but stated "I'll fucking go ahead and start hustling right now." With the phrase "hustling," OLIVER meant that he would begin to distribute drugs for profit. Later during the call, OLIVER described how the recent court disposition unfolded, stating "I got a lawyer instead, they knocked that shit out cuz I flushed everything they didn't get shit I fucking flushed it." I believe that OLIVER was advising BUTLER that his charges had been dropped because he was able to destroy evidence, and all that was recovered was "weed and my pipe." I know from training and experience that drugs which are powder based, such as heroin and cocaine, are easier to dispose of through a toilet rather than marijuana ("weed").

*Subject Devices-11, -12, and -13*

44.    On April 3, 2019, Cindy LEGARD was placed under arrest pursuant to a federal arrest warrant at her residence located at 277 Specks Run Road, Apartment 1, Bunker Hill, West Virginia. In conjunction with her arrest a federal search and seizure warrant was executed at 277 Specks Run Road.

45.    Recovered from the residence were the following: a tied plastic baggie containing a grey substance suspected to be heroin, 2 vials containing a brown substance suspected to be heroin, 22 Buprenorine strips, 2 vials containing a green leafy substance suspected to be marijuana,

2 glass capsules with powder residue, 3 orange pills of unknown substance, and a prescription bottle disaplying the name Cindy LEGARD containing 6 orange pills. Officers also seized the following cellular phones from the residence: a white Apple Iphone bearing evidence barcode E5357248 (**SUBJECT DEVICE-11**), a black LG cellular phone with a style case bearing evidence barcode E5357243 (**SUBJECT DEVICE-12**), and a Samsung cellular phone bearing evidence barcode E5357242 (**SUBJECT DEVICE-13**).

46.     Through the course of the investigation, LEGARD was identified as another re-distributor who would travel to Baltimore to purchase drugs and then return to West Virginia to resell them. For example, on January 2, 2019 beginning at approximately 9:34am and ending at 12:15pm, BUTLER's phone had an SMS text exchange with the cellular phone number 304-820-2831, which investigators know was used by LEGARD. A portion of this exchange is listed below:

| | |
|---|---|
| C. LEGARD: | Hey babe. This is cindy silver prelude. I haven't been down in forever since shit went down with me. I'm still scared to come at this point but I'm trying to get back together. I'm late on rent and shit. Was wondering if you would let me send my bro with 200 if you would let me get 5 and owe you 150 next time? You can call and make sure its me if you want lol. Got a new number and shit. I'm hoping I'll be able to come myself soon enough, but I'm still a little worried right now. |
| BUTLER: | 3363 falls road Baltimore 21211 |
| C. LEGARD: | Thanks babe. He's going to leave here soon. I'll send my phone with him if you want. He has a number to reach me at if anyone wants to call to make sure its me. Thanks love |
| BUTLER: | I'm not doing that |
| C. LEGARD: | Well can i get 3 for 210 |
| BUTLER: | Ok |

47.     On January 2, 2019 at approximately 6:09pm LEGARD and TT1 had a similar SMS

text conversation:

| | |
|---|---|
| C. LEGARD: | Hey i need com back and get 4 is that cool |
| BUTLER: | ,4414 Alan Dr Baltimore MD 21229 |
| C. LEGARD: | I need 4 |
| BUTLER: | K |

48.     Based on my training and experience in this investigation, the above listed SMS text message threads are typical of a customer contacting the BUTLER DTO to purchase drugs. There is an initial SMS text and the customer receives a location ("3363 falls road" and "4419 Alan Dr"). BUTLER then receives a number from LEGARD ("5," "3," and "4") representing the quantity of drugs, typically in grams, that LEGARD seeks to purchase.

*Subject Device-14*

49.     On April 3, 2019 a federal search and seizure warrant was executed at 732 Denison Street in Baltimore, Maryland. Present in the residence was a lone adult male, Davon OWENS. Recovered from the residence was a duffle bag. Inside the duffle bag was approximately 14 plastic baggies, which contained a large quantity of a brown substance suspected to be heroin. Inside OWENS's room was a 9mm handgun and a Samsung cell phone bearing IMEI 354254090158051(**SUBJECT DEVICE-14**)

50.     The stash of suspected heroin inside the duffle bag was consistent with interceptions between OWENS and other members of the DTO, which indicated that OWENS would store narcotics at his home in Baltimore and provide them to a supervisor in the DTO whenever the DTO needed a re-supply of narcotics.

*Subject Devices-15 and -16*

51.     On April 3, 2019, pursuant to a federal arrest warrant, Kareem MACK was placed under arrest in Baltimore, Maryland. In the course of this investigation MACK was identified as

a street level distributor for the BUTLER DTO. MACK often used the phone to communicate with BUTLER, RINGGOLD, and SAUNDERS regarding details of their illicit enterprise, as illustrated by the call below. At the time of his arrest, MACK was in possession of two cellular phones: a black Apple iPhone, model A1549, IMEI: 355785075069812 with a blue case (**SUBJECT DEVICE-15**) and a pink Apple iPhone, Model A1662, IMEI: 356599081155856 with a black case (**SUBJECT DEVICE-16**).

52.     On February 22, 2019 at approximately 3:52pm, TT4 called the cellular phone number 443-902-4949, which is a number investigators know was used by MACK. A portion of the conversation is listed below:

MACK:       Yeah dummy

BUTLER:     Hey yo there's a 10 right there in a Uhaul

MACK:       Aight I gotchu dummy

BUTLER:     *[U/I]* Yo I thought you was movin yo?

MACK:       I'm bout to move I'm bout to wait for Pretty come holla at me cuz he bout to bring me a whole nother 120, I need get that first before I move anything

53.     Based on my training and experience in this investigation, in the above listed conversation, BUTLER was contacting MACK to advise that a drug customer was located in a U-Haul truck. Toward the end of the conversation, MACK indicated that he was waiting co-conspirator "Pretty" to "bring me a whole nother 120." Based on my training and experience, I know that this statement means "Pretty" would be delivering 120 grams of drugs to MACK.

*Subject Devices-17 and -18*

54.     On April 3, 2019 Edward HALL was placed under arrest pursuant to a federal arrest warrant. HALL was located in the driver's seat of a Ford bus which was parked in a parking lot. Located within arm's reach to HALL and in plain view was a loaded 9MM handgun. HALL

21

was also in possession of an unknown quantity of a powder substance suspected to be heroin. The Ford bus was subsequently seized and towed to a secure FBI facility. Through the investigation, law enforcement identified HALL as one of the main street-level drug distributors used by the BUTLER DTO, as evidenced by the interception described above between HALL and RINGGOLD on December 27, 2018 and the interception described below between HALL and BENNETT on December 26, 2018, among other interceptions.

55.     On April 9, 2019, a federal search and seizure warrant was executed on the Ford bus. Recovered within the Ford bus was a red plastic baggie containing a powder substance suspected to be heroin, a clear capsule containing a powder substance suspected to be heroin, a plastic bag containing 50 9MM bullets, a black Boost cellular phone (**SUBJECT DEVICE-17**), and a gold colored Motorola cellular phone bearing serial number ZY225BP4RF (**SUBJECT DEVICE-18**).

*Subject Device-19*

56.     On April 9, 2019, a federal search and seizure warrant was executed on a black Honda sedan, which had been seized from Gregory BUTLER. Recovered inside the passenger compartment of the Honda was a .22 caliber semi-automatic handgun, a plastic baggie containing a white chunk substance (suspected crack cocaine), a plastic baggie containing a brown chunk substance (suspected heroin), and a white-gold Apple I-phone bearing FCCID: BCGE2945A (**SUBJECT DEVICE-19**).

*Subject Device-20*

57.     On April 5, 2019, Donte BENNETT was placed under arrest pursuant to a federal arrest warrant in Cumberland, Maryland. At the time of his arrest, BENNET was in possession of an Apple iPhone, Model A1586, bearing IMEI: 356150094375295, with a cracked screen and

black rubber cover (**SUBJECT DEVICE-20**).

58.     Through the ongoing investigation, Donte BENNETT has been identified as one of several street-level distributors who dispensed drugs to customers.  BENNETT also transferred illicit proceeds to the managers of the BUTLER DTO and received drugs from said managers to distribute.  The investigation revealed that BENNETT used a cellular phone to further these illegal activities.

59.     On December 26, 2018 at approximately 3:48pm, Edward HALL called the telephone number 443-629-7135, a phone investigators know was used by Donte BENNETT.  A portion of the conversation is listed below:

BENNETT:     Yo hey yo ugh just let me know

HALL:     Yo

BENNETT:     let me know when you get up in your house so I can ugh ugh get somebody run me around there

HALL:     He's out

BENNETT:     Oh damn aight

HALL:     He don't have nothin. I keep I told you yesterday he had a lil bit and he was tryin to re-up and he ain't never re-up.

BENNETT:     Oh aight

HALL:     I meant to text you but I you know he he keep sayin somebody there and shit man... Man yo just off his rocker man he keep sayin you he he don't even he talkin bout he said *[ui]* I look back man ain't no sense in lookin back ain't even on the fuckin phone.  Talkin about look at the phone look, man nobody here you ain't say shit I just hung up on his ass

60.     Based on my training and experience in this investigation and others, in the above listed conversation HALL and BENNETT were discussing the current supply of drugs. The supply was running low as indicated by HALL's statements that "He's out" and that "He don't have

23

nothing. I keep I told you yesterday he had a lil bit and he was trying to re-up and he aint never re-up." BENNETT then acknowledged the low supply. HALL later in the call discussed the fact that their source (BUTLER) was attempting to "re-up" but had not done so yet. I know that the term "re-up" means to re-stock a drug supply.

61.     On December 29, 2018 at approximately 4:57pm, BENNETT again called HALL. A portion of the conversation is listed below:

| | |
|---|---|
| HALL: | Yo. |
| BENNETT: | Hey yo give me a hand of some extra girl. |
| HALL: | What you mean? |
| BENNETT: | Like some single girl, or. |
| HALL: | Say it again. |
| BENNETT: | I said you don't have no single girl? |
| HALL: | No, my my girl? |
| BENNETT: | Yeah. |
| HALL: | No hard? Nah, that's it. We really ain't have none. I just had that. |
| BENNETT: | Oh aight. |
| HALL: | That shit gone isn't it? |
| BENNETT: | Hell yeah. |
| HALL: | We ain', we ain't got none. If I wouldn't have them we, you, shit K-Mac I ain't give 'em to him. I ain't give 'em to Mazzi. We ain't had none since Mazzi day. |
| BENNETT: | Damn. |
| HALL: | Yeah we ain't have no coke since Mazzi day. Yup. They all out of that shit. I don't know what Little Dick doing. |

62.     Based on my training and experience in this investigation, in the above listed

conversation HALL and BENNETT are discussing that a particular drug that was running low. I know that the term "girl" is a coded street term for cocaine and that "hard" is a street term for crack cocaine. BENNETT was asking HALL about obtaining some cocaine ("give me a hand of some extra girl."). HALL advised that "we ain't got none." He later specifically stated, "we ain't have no coke since Mazzi day," again referring to cocaine.

## CONCLUSION

63.    Based on the information set forth in this affidavit, I believe that probable cause exists that in the SUBJECT ELECTRONIC DEVICES, there is evidence, fruits, and instrumentalities of the crimes of 21 U.S.C. § 846 (conspiracy to possess with intent to distribute a controlled substance), and 21 U.S.C. § 841 (possession with intent to distribute and the distribution of a controlled substance). I respectfully request that this Court issue a seizure warrant for the SUBJECT ELECTRONIC DEVICES, and authorize the subsequent search and seizure of the items described in Attachments A, according to the protocols set forth in Attachment B.

64.    To the extent that the warrant authorizes the seizure of any tangible property, any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

65.    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is good cause for the Court to authorize execution of the warrant at any time in the day or night.

19 - 1 5 9 3 BPG

Task Force Officer James Walsh
Federal Bureau of Investigation

Subscribed and sworn before me this _____ day of May, 2019.

Honorable Beth P. Gesner
Chief United States Magistrate Judge
District of Maryland

26

**ATTACHMENT A**      19 - 1 5 9 3 **BPG**

**Items to be Searched**

| | |
|---|---|
| *Subject Device-1* | A black Apple I-phone bearing IMEI 352987091210551 |
| *Subject Device-2* | A black Apple I-phone bearing serial number FD6W921LJCM2 |
| *Subject Device-3* | An Apple I-phone in a blue case bearing serial number FDCVP16MJCM1 |
| *Subject Device-4* | A white Apple I-phone bearing evidence bar code E6096504 |
| *Subject Device-5* | A black Apple phone bearing evidence barcode E5433188 |
| *Subject Device-6* | An Apple I-pad with a white-grey cover bearing serial number DLXA49LFG5V3 |
| *Subject Device-7* | A gold colored Apple I-phone with a black case bearing IMEI 359238069975285 |
| *Subject Device-8* | A silver Apple I-phone with a cracked screen and a green/grey case bearing IMEI 352018076957907 |
| *Subject Device-9* | A silver Samsung cell phone model SM-J327P, DEC number 8916889690846451 |
| *Subject Device-10* | A BLU cell phone with a clear case bearing serial number 352908091349322 |
| *Subject Device-11* | A white Apple IPhone bearing evidence barcode E5357248 |
| *Subject Device-12* | A black LG cellular phone with a style case bearing evidence barcode E5357243 |
| *Subject Device-13* | A Samsung cellular phone bearing evidence barcode E5357242 |
| *Subject Device-14* | A Samsung cell phone bearing IMEI 354254090158051 |
| *Subject Device-15* | A black Apple iPhone, model A1549, IMEI: 355785075069812 with a blue case |
| *Subject Device-16* | A pink Apple iPhone, Model A1662, IMEI: 356599081155856 with a black case |
| *Subject Device-17* | A black Boost cellular phone recovered from a Ford bus parked in a parking lot on April 3, 2019 |
| *Subject Device-18* | A gold colored Motorola cellular phone bearing serial number ZY225BP4RF |
| *Subject Device-19* | A white-gold Apple I-phone bearing FCCID: BCGE2945A |
| *Subject Device-20* | An Apple iPhone, Model A1586, bearing IMEI: 356150094375295, with a cracked screen and black rubber cover |

These SUBJECT ELECTRONIC DEVICES are currently located at 30 West Gude Drive, Rockville, Maryland.

1

## ATTACHMENT B

## ITEMS TO BE SEIZED

All records contained in the items described in Attachment A which constitute evidence of violations of 21 U.S.C. §§ 841, 846, as outlined below:

1. All of the following for each of the Devices:

   a. Digital images;

   b. Digital videos;

   c. Records of incoming and outgoing voice communications;

   d. Records of incoming and outgoing text messages/MMS;

   e. The content of incoming and outgoing text messages/MMS;

   f. Voicemails;

   g. Voice recordings;

   h. Encrypted messaging platform content, such as WhatsApp messages;

   i. Lists of customers and related identifying information;

   j. Contact lists;

   k. Records of types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   l. Information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   m. bank records, checks, credit card bills, account information, and other financial records;

   n. Information recording any schedules or travels; and

2. Any and all records related to the location of the device(s) or user(s) of the devices.

3. For each of the Devices:

1

a.  Evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

e.  evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Devices;

f.  evidence of the times the Devices were used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the Devices;

h.  documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

i.  contextual information necessary to understand the evidence described in this attachment.

4.  With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a.   surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b.   "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c.   "scanning" storage areas to discover and possible recover recently deleted files;

d.   "scanning" storage areas for deliberately hidden files; or

e.   performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

5.   If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.